*NOT FOR PUBLICATION*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

```
_____   :
                                      :
LOUIS S. SAMPERI,                     :
                                      :
                  Plaintiff,          :          Civil Action No. 18-9382 (FLW)
                                      :
        v.                            :
                                      :               OPINION
                                      :
NANCY A. BERRYHILL,                   :
Acting Commissioner of Social Security, :
                                      :
                  Defendant.          :
_____   :
```

**WOLFSON, United States District Judge:**

Louis S. Samperi ("Samperi" or "Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Nancy A. Berryhill ("Defendant") denying Plaintiff disability benefits under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") opinion was based on substantial evidence and, accordingly, affirms the decision.

**I.        FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff was born on July 14, 1972, and, beginning in 1997, worked as a Verizon field technician. AR 96. On July 10, 2014, Plaintiff lifted a heavy cable while at work and injured his back and knee. AR 96-97. Over the course of the next three years, Plaintiff underwent five surgical procedures, including a neck fusion, lumbar fusion, right knee surgery, right shoulder surgery, and right bicep surgery. AR 29.

On June 25, 2015, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging that his asthma, lower back, and right knee precluded him from working, beginning on the date of his accident, July 10, 2014. AR 96. These claims were denied initially on September 8, 2015, AR 104, and upon reconsideration on November 19, 2016. AR 121. Thereafter, Plaintiff filed a written request for a hearing on February 19, 2016. AR 134-35. In October 2017, ALJ Nicholas Cerulli held a hearing, at which Plaintiff (who appeared with counsel) and an impartial vocational expert ("VE") testified. AR 53-95. On December 20, 2017, the ALJ issued a written decision affirming the denial of Plaintiff's benefits. AR 20-47.

Plaintiff challenges several aspects of the ALJ's decision. Specifically, Plaintiff asserts that: (1) the ALJ erred at step three in finding that Plaintiff failed to demonstrate that his combined spinal impairments medically equaled the Commissioner's Listings of presumptively disabling impairments ("Listings"); (2) the ALJ failed to consider all of Plaintiff's impairments in combination; (3) the ALJ improperly weighed the opinion evidence of certain medical sources; and (4) the ALJ improperly characterized all of Plaintiff's musculoskeletal conditions as degenerative.

### A. Medical Evidence[1]

1. <u>Seaview Orthopaedic & Medical Associates</u>

---

[1] The medical evidence discussed here relates mainly to what Plaintiff terms his "primary" medical conditions. The record also contains evidence regarding certain "secondary" conditions, most of which long predated Plaintiff's accident, including asthma that was purportedly linked to clean up work after the September 11, 2001 attacks, diabetes linked to steroid use, and certain psychological conditions. These conditions, aside for the asthma, were not bases for Plaintiff's disability application, and, moreover, Plaintiff does not contend that the ALJ improperly weighed or overlooked any of this evidence.

On July 11, 2014, Plaintiff visited a spine surgeon, Dr. Praveen Yalamanchili of Seaview Orthopaedic & Medical Associates ("Seaview") at the request of a workers' compensation case manager due to back pain. AR 964-67. Plaintiff explained that he had been "lifting a heavy cable when he felt his knee buckle and had severe pain on the right side of his lower back," which caused "constant pain" that "radiates from his lower back down the outside aspect of his right leg to the dorsum and outside of his foot." AR 965. Plaintiff further advised that he was already "[t]aking oxycodone 30 mg," among other medications. AR 966. X-rays of Plaintiff's lumbar spine revealed degenerative scoliosis, L5-S1 anterolisthesis, and the possibility of spondylolytic defects at L5. AR 966. Dr. Yalamanchili assessed spondylolisthesis, radiculopathy, and lumbar strain, and recommended "a Medrol Dosepak, a brace f[or] [Plaintiff's] lower back, muscle relaxers and pain medication as well as physical therapy." AR 967. Dr. Yalamanchili "place[d] [Plaintiff] on sedentary duty only[;] [i]f there is no sedentary duty, he will be out of work." AR 967.

Plaintiff returned to Dr. Yalamanchili on July 23, 2014, and underwent an MRI that revealed a central disc herniation at L3-4, a broad disc bulge at L4-5, and anterolisthesis leading to moderate bilateral foraminal stenosis. AR 404-05. An EMG on August 15, 2014, showed right LS radiculopathy and peripheral neuropathy (secondary to diabetes). AR 409. On August 21, 2014, in the wake of the MRI and EMG results and Plaintiff's minimal progress in physical therapy, Dr. Yalamanchili referred Plaintiff to pain management for consideration of injection therapy. AR 910, 912.

In September 2014, Dr. Robert Pannullo, a pain management physician, recommended an epidural injection, and suggested that Plaintiff be limited to sedentary work. AR 879-81. On December 2, 2014, Dr. Pannullo noted that Plaintiff suffered from radiating pain to the toes,

diminished sensation in the right foot, positive straight leg raising (SLR) on the right and an antalgic gait. AR 376-78. Dr. Pannullo administered a series of injections to Plaintiff, including one injection in November 2014, which provided at least 25 to 30% improvement, AR 763, 974, and another in January 2015, which provided up to 40% improvement. 678, 972. In February 2015, Dr. Pannullo recommended a TENS unit, cyclobenzaprine, and a surgical evaluation, but recommended "holding off on any further spinal injections" due to lack of evidence that they had "made a difference." AR 680.

Plaintiff also received medical treatment due to knee injuries from the accident from Dr. C.J. Spagnuola, also of Seaview, at the request of a workers' compensation case manager. AR 960-63. On July 16, 2014, Plaintiff visited Dr. Spagnuola, who noted that while Plaintiff "mainly hurt his back initially," he had "been noticing …pain in his back radiating down his leg" that was "focused in the knee." AR 961. Following x-rays, Dr. Spagnuola assessed a medial meniscus tear, current, and a medial collateral ligament sprain, and provided Plaintiff with a hinged knee brace. AR 962. Dr. Spagnuola placed Plaintiff on "[l]ight duty from today to [his] next appointment," AR 963, but also stated that he is "a candidate for sedentary type activities" and should be on "[s]edentary work only 5 days/week." AR 962-63.

On July 24, 2014, Dr. Spagnuola administered an MRI of Plaintiff's right knee, which indicated chondral changes on the patella's undersurface, but it revealed no fracture and no definitive meniscus tear. AR 411, 941. Dr. Spagnuola ordered physical therapy and continuation of the use of the knee brace. AR 942. His opinion as to the level of exertional work Plaintiff could perform remained unchanged, *i.e.* "[s]edentary work only 5 days/week." AR 942. On September 10, 2014, Dr. Spagnuola reviewed Plaintiff's MRI, which revealed "no definitive meniscal tear, but he has had persistent pain which is consistent with a meniscal tear and giving

way of the knee," and "[h]e also has chondral damage to the patellofemoral joint." AR 876. In light of Plaintiff's persistent pain and after discussion with Plaintiff, Dr. Spagnuola concluded that Plaintiff's "only option is a diagnostic and operative arthroscopy to improve the function in the knee." AR 877. After a corticosteroid injection in October 2014 provided little relief, Plaintiff elected to proceed with surgery. AR 707, 799, 801, 835.

On March 5, 2015, Dr. Spagnuola performed a right knee diagnostic and operative arthroscopy with arthroscopic microfracture arthroplasty of the femoral trochlea, partial lateral meniscectomy, arthroscopic synovectomy, and arthroscopic removal of loose body, greater than 5 mm. AR 370, 969. Plaintiff "tolerated the procedure well." AR 969. Following the surgery, Plaintiff resumed physical therapy, and Dr. Spagnuola described Plaintiff as "a candidate for light duty restrictions at work"; in April 2015, Dr. Spagnuola noted Plaintiff "should be restricted from lifting anything over 15 lbs." AR 620, 641.

On May 6, 2015, Dr. Spagnuola discharged Plaintiff from his care, determining that "examination of the right knee shows his wounds are well healed," concluding that Plaintiff had "reached maximum medical improvement, … [and] can return to work full duty without restrictions." AR 586-87.

2. Dr. Andrew Merola

Plaintiff visited Dr. Andrew Merola, a spinal surgeon, from April 2015 through April 2017. Upon initial evaluation in April 2015, Dr. Merola ordered a CT scan and an MRI of Plaintiff's lumbar spine, the latter of which revealed a herniation at L3-L4 and another at L4-L5 with a left-sided paraforaminal component, and a lysis and a listhesis at L5-S1. AR 402-03, 406-07, 993-95. On a follow-up visit on April 24, 2015, Dr. Merola opined that Plaintiff is "100% totally disabled from all work and duties." AR 992. After reviewing treatment options and

alternatives with Dr. Merola, Plaintiff agreed to a decompressive lumbar laminectomy and spinal fusion of those segments. AR 990-91, 993.

Dr. Merola performed this surgery on June 25, 2015. AR 1140-42. Plaintiff responded well to the procedure, advising that "the severe shooting pain into the legs has been helped" and that "[h]e is utilizing his low back." AR 988. Dr. Merola noted that Plaintiff's "sensory, motor and neurological function is … stable," and ordered physical therapy, and advised Plaintiff against bending, lifting, or twisting. AR 988. Plaintiff had a number of follow-up visits to Dr. Merola throughout 2015 and 2017, all of which confirmed that the surgery had been successful. For instance, in October 2015, Dr. Merola reviewed new x-rays of the lumbar spine that were unremarkable and reflected only the results of Plaintiff's June 2015 surgery, and deemed Plaintiff "neurologically stable." AR 986. This was also true at visits in December, 2015, May 2016, October 2016, January 2017, April 2017, and July 2017. AR 976, 978, 981, 983, 985, 986. After the latter two appointments, Dr. Merola made the following observation regarding Plaintiff's lumbar spine: "Physical findings on examination today demonstrate that with respect to the lumbar spine, lower extremity, legs and feet, from [a] sensory, motor, neurological and spinal reconstructive perspective, this patient remains otherwise stable. No progressive deficits are noted." AR 976, 1125.

In addition to the treatment for Plaintiff's lumbar spine, Dr. Merola also treated Plaintiff for his cervical spine issues. In October 2015, Plaintiff first advised Dr. Merola of cervical spine complaints and of right shoulder pain. AR 986. Dr. Merola recommended conservative treatment to the neck, such as strict activity restrictions, and to continue a low back program, avoid activities that reproduce pain and symptoms, avoid bending, lifting, and twisting. AR 986. In January 2016, Dr. Merola reviewed a December 2015 cervical spine MRI, which revealed C4-C5

central and right paraforaminal herniation and C5-C6 central herniation; Dr. Merola recommended continuation of "conservative management and treatment[,] … including epidural steroid injections." AR 984. In October 2016, Dr. Merola recommended an updated EMG/nerve conduction study and cervical spine MRI. AR 981. Dr. Merola's review of the November 2016 MRI revealed compression present and appreciated at C5-C6, canal stenosis present at C5-C6, and right paraforaminal compression at C6-C7. AR 980. His review of the EMG/NCS indicated that the results were consistent with cervical radiculopathy. AR 978.

In January 2017, Plaintiff agreed to neck surgery "to prevent further neurological deterioration," and Dr. Merola requested approval from the workers' compensation carrier to perform an anterior cervical discectomy and spinal fusion of the C5, C6, and C7 vertebral segments. AR 978. The surgery ultimately occurred in September 2017, which Plaintiff "tolerated well." AR 1138-39. On October 20, 2017, Dr. Merola completed a one-page "box check" form, indicating that Plaintiff could lift and carry up to 10 lbs. occasionally, but, during an eight-hour workday, frequently needed to recline, could sit for a total of only two hours or less, and could stand and/or walk for a total of only two hours or less. AR 1143.

### 3. Dr. Charles DeMarco and Dr. Steven Touliopoulos

From November 2015 to August 2017, Dr. Charles DeMarco, an orthopaedic surgeon, treated Plaintiff for his shoulder pain. AR 997-1000, 1017-22, 1051-55, 1110-24. In November 2015, Dr. DeMarco assessed impingement and instability of the right shoulder, ruled out rotator cuff and labral pathology. 997-99, 1021-22. X-rays and an MRI taken then revealed degenerative changes in the right acromioclavicular (AC) joint, suspected labral tear, and osteoarthritis. AR 997-99, 1021-22. When Plaintiff indicated that he did not want right shoulder surgery, Dr. DeMarco ordered physical therapy and a course of conservative management. AR 1000, 1017, 1019-21. The following summer, in June 2016, Dr. Steven Touliopoulos assessed Plaintiff with

"shoulder posttraumatic irnpingement/instability/labral tearing/suspicious for rotator cuff," and recommended right shoulder arthroscopic surgery. AR 1052. On August 22, 2016, Plaintif "underwent arthroscopic repair of SLAP lesion and capsular plication of the right shoulder." AR 1052, 1110-12, 1122-24.

Approximately five months later, in January 2017, Plaintiff returned to Dr. DeMarco to advise of newly-arising issues in his right knee. AR 1119. Following evaluation, Dr. DeMarco opined that Plaintiff "remains totally disabled." AR 1119. The next month, Dr. DeMarco reviewed x-rays and an MRI of Plaintiff's right knee and noted that he has "ACL deficiency" and "[a]dvanced degenerative arthritis, [and so] may be a candidate for knee replacement surgery." AR 1117-18. In May 2017, Dr. DeMarco diagnosed degenerative arthritis and torn meniscus and advised that Plaintiff "will eventually require surgical intervention" AR 1118. From May 2017 to August 2017, that diagnosis remained unchanged. AR 1113-16. In July 2017, Plaintiff received an Synvisc-One injection in his right knee, which produced "good improvement of symptoms." AR 1113-14. In July and August 2017, Dr. Demarco ordered Plaintiff to continue a course of conservative management and physical therapy. AR 1113-14.

4. Dr. Kevin H. Weiner, and Dr. Feliks Karafin.

In December 2015, Plaintiff visited Dr. Kevin Weiner, a Physical Medicine and Rehabilitation specialist, for his back pain. AR 1016. Dr. Weiner advised him to continue with his pain medication and exercise (including aquatherapy). AR 1016. In January 2016, Dr. Weiner noted that an MRI revealed C4-5, 5-6 herniation, and opined that Plaintiff "is totally disabled." AR 1015. Dr. Weiner again advised Plaintiff to continue with his pain medication, among other things. AR 1015. The same month, Dr. Feliks Karafin, another pain management physician, noted that the NCS tests revealed evidence of right C8-T1 radiculopathy and bilateral carpal tunnel syndrome. AR 1013. He opined that Plaintiff "is completely disabled and unable to return

to work." AR 1014. Dr. Karafin stated that Plaintiff's pain medications provide significant relief and advised that physical therapy should be continued and that cervical injections would be tried on an upcoming visit. AR 1013-14.

A year and a half later, on August 29, 2017, Dr. Karafin noted that Dr. DeMarco had stopped doing injections in Plaintiff's right knee. AR 1137. Dr. Karafin opined that Plaintiff "remains 100% disabled and unable to return to work." AR 1137. Dr. Karafin also noted that Plaintiff's "shoulder improved significantly," his "[r]ange of motion is better" and that Plaintiff had "already started to lift up to 20 to 25 pounds in each hand." AR 1137. Dr. Karafin and Plaintiff agreed upon continuation of physical therapy for the right shoulder for another week. AR 1137.

5.   Dr. Regina O. Hillsman

At the request of the workers' compensation carrier, Plaintiff visited Dr. Regina O. Hillsman for an independent orthopedic examination on July 10, 2017. AR 1131-35. At the time of the examination, Plaintiff reported that his current complaints were "of neck pain radiating to the right shoulder with tingling and to the right upper extremity with numbness and tingling, left hand pain with numbness and tingling and lower back pain radiating to the right hip, to the right leg and to the right knee." AR 1132. With respect to Plaintiff's cervical spine and thoraco-lumbar spine, Dr. Hillsman found "no motor weakness," "no sensory loss" and "[n]o atrophy." AR 1133. Also, with respect to Plaintiff's thoraco-lumbar spine, the straight leg raise and double straight leg raise tests were negative. AR 1133.

Hillsman diagnosed: "Cervical sprain/strain/contusion, resolving[;] [l]umbar sprain/strain/contusion resolving[;] [r]ight shoulder sprain/strain/contusion, resolving[;] [r]ight knee sprain/strain/contusion, resolving[;] [s]tatus post fracture of the: right wrist[;] [s]tatus post-surgery: lumbar spine surgery[;] and [s]tatus post arthroscopies of the right shoulder and right

knee." AR 1134. She opined that Plaintiff "has a temporary total 100% disability" and "should not return to work at this time." AR 1134. Dr. Hillsman opined further that the cervical surgery requested by Dr. Merola appeared to be clinically indicated and that Plaintiff had not yet "reached maximum medical improvement from an orthopedic point of view." AR 1134.

      6.  <u>Agency Medical Experts</u>

On May 16, 2014, Pamela Foley, Ph.D., reviewed Plaintiff's medical record and prepared a mental RFC assessment. AR 71-76. In September 2015, Lourdes Marrero, M.D., reviewed the file and opined that "[t]here is no listing severity met or equaled." AR 103. She also opined that Plaintiff could lift and/or carry 10 pounds occasionally and frequently; stand and/or walk for two hours, and sit for about six hours, in an eight-hour work day; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and that he was to avoid concentrated exposure to extreme cold and heat, wetness, and humidity. AR 101-02. In November 2015, Toros Shahinian, M.D., reviewed the file and affirmed Dr. Marrero's determinations. AR 117.

**B.  Plaintiff's Testimony Before ALJ**

Plaintiff testified at the October 27, 2017 hearing before ALJ Nicholas Cerulli. Plaintiff testified that he received his GED out of high school. AR 62. He currently lives at home with his wife, and he has no trouble driving a car, though he does not do so very often. AR 43.  Plaintiff worked as manhole worker, or "splicer," for Verizon until July 10, 2014, when he had his accident. AR 67.  He received sickness and disability benefits from Verizon for about a year after the accident, and he has been receiving workers compensation benefits since then. AR 65-66.

Plaintiff sustained injuries to his c-spine, knee, shoulder, biceps, and mid and lower back in his accident. Following the accident, Plaintiff underwent surgeries on his knee, shoulder, biceps, neck and back between 2014 and 2017. AR 70. According to Plaintiff, due to his back injuries, he "couldn't do anything for quite some time," and his wife had to act as a caretaker.

AR 71-72. He stated that his "low back is never going to be the same," which is why he walks with a cane. Regarding his shoulder injuries, Plaintiff noted that "[t]he numbness and the tingling that I had is getting better," though he would still have pain were he to throw a ball. AR 74, 75. Plaintiff also testified that, following the accident, he had issues with hands, including frequently dropping things, but that he could still write, though his handwriting was now "totally different." AR 77. He further stated that, "I try to utilize my hands as much as I could." AR 78. According to Plaintiff, his pain medications have helped relieve his pain. AR 84.

### C. ALJ's Decision

On December 20, 2017, the ALJ rendered a 28-page written decision. AR 20-47. At step two, the ALJ found that Plaintiff had a number of severe impairments: "cervical degenerative disc disease, lumbar degenerative disc disease, right shoulder degenerative joint disease, right knee degenerative joint disease, chronic obstructive pulmonary disease, diabetes mellitus, major depressive disorder and post-traumatic stress disorder." AR 23. However, at step three, the ALJ found that none of these impairments, individually or in combination, met or equaled the Commissioner's Listings of presumptively disabling impairments. AR 23-28. A step four, the ALJ further determined that Plaintiff retained the RFC to perform only a range of sedentary work with a number of postural, environmental, and other nonexertional limitations. AR 28-45. At step five, a VE confirmed that, even with all of those restrictions, a person of Plaintiff's age (41 years old at his alleged onset date) with at least a high school education could perform jobs that exist in significant numbers in the national economy. AR 46. The ALJ, therefore, concluded that, from Plaintiff's alleged disability onset date through the date of the decision, Plaintiff was not disabled within the meaning of the Act. AR 46-47.

## II.     STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his

or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id*.

## III.    DISCUSSION

Plaintiff challenges several aspects of the ALJ's decision. Specifically, Plaintiff asserts that: (1) the ALJ erred at step three in finding that Plaintiff failed to demonstrate that his combined spinal impairments medically equaled the Listings; (2) the ALJ failed to consider all of Plaintiff's impairments in combination; (3) the ALJ wrongly weighed the opinion evidence of certain medical sources; and (4) the ALJ improperly characterized all of Plaintiff's musculoskeletal conditions as degenerative.

### A.  The ALJ's Finding that a Listing Was Not Met or Equaled

Plaintiff asserts that the ALJ erred at step three in the sequential evaluation process in finding that his combined lumbar and cervical spine impairments did not medically equal the severity of the Listing 1.04A (Disorders of the Spine). The Listings are a regulatory device used to identify those claimants whose medical impairments are so severe that they would be found disabled regardless of their vocational background. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). To meet a listed impairment, a plaintiff is required to prove that she "meet[s] *all* of the specified medical criteria." *Id*. at 530 (emphasis in original). Meeting only some criteria for a listing, "no matter how severely, does not qualify." *Id*. The plaintiff bears the burden of proving a presumptively disabling impairment under the listings. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

To establish *per se* disability under Listing 1.04A, Plaintiff was required to have presented evidence demonstrating *each* of the following: (1) a disorder resulting in compromise of a nerve root or the spinal cord; (2) nerve root compression characterized by neuro-anatomic distribution of pain; (3) limitation of motion of the spine; (4) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss; and (5) if there is

involvement of the lower back, positive straight leg-raising test (sitting and supine). 20 C.F.R. §

404, Subpt. P, App. 1.

When a plaintiff is unable to match a Listing, he may demonstrate that his impairment is

equal in severity to a Listing. To use this method, *i.e.*, to "equal" a Listing, a plaintiff "must

present medical findings equal in severity to *all* the criteria for the one most similar listed

impairment.'" *Zebley,* 493 U.S. at 530-31 (emphasis in original); *see also Lopez v. Berryhill*, No.

17-1073, 2017 WL 5889740, at *4 (D.N.J. Nov. 28, 2017); *Ortiz v. Colvin*, No. 14-4805, 2016

WL 164995, at *7 (D.N.J. Jan. 14, 2016) ("An impairment is 'equivalent' to a listed impairment

only where it is supported by medical findings equal in *severity* to all of the criteria applicable to

the most similar Listing." (Emphasis in original.)). Thus, to have medically equaled Listing

1.04(A), Plaintiff was required to have produced medical findings demonstrating that his

combined spinal impairments were equal in severity to *each* of Listing 1.04(A)'s requirements.

In accordance with the regulations, the ALJ considered in detail Plaintiff's spinal

impairments and found that they were not so severe that they met or medically equaled the high

standard of Listing 1.04(A)[2]:

> The claimant's degenerative disc disease does not meet or medically equal Listing
> 1.04 because the record does not demonstrate compromise of a nerve root
> (including the cauda equina) or the spinal cord with additional findings of
> distribution of pain, limitation of motion of the spine, motor loss (atrophy with
> associated muscle weakness) accompanied by sensory or reflex loss and, if there is
> involvement of the lower back, positive straight-leg raising; or B) spinal
> arachnoiditis; or C) lumbar spinal stenosis resulting in pseudoclaudication.

AR 24. As the ALJ noted, this finding was supported by the opinions of Dr. Merola, who

repeatedly stated that, despite the injuries, Plaintiff's lumbar spine was stable from a "sensory,

---

[2] The ALJ, in fact, considered whether Plaintiff's impairments met or equaled multiple listings,
and, for each, found that they did not. AR 23-28.

motor, and neurological" perspective. AR 31-32. As the ALJ's decision also states, Dr.

Hillman's July 2017 independent orthopedic examination analyzed Plaintiff's lumbar and

cervical spine, which exhibited no motor weakness, sensory loss or atrophy in either; also, "[h]is

straight-leg raise test was negative." AR 32-33. Thus, the ALJ detailed concrete reasons why

Plaintiff did not meet the Listings, and specifically found that Plaintiff had no "combination of

impairments that meets or medically equals the severity of" a Listing. AR 23. This detailed

discussion presented a "sufficient development of the record and [an] explanation of findings to

permit meaningful review." *See Johnson v. Comm'r of Soc. Sec.*, 398 F. App'x 727, 734 n.5 (3d

Cir. 2010) (citation omitted). It is of no moment that the ALJ discussed some of this evidence

throughout the opinion, and not always specifically in the step three analysis, as an ALJ's

decision must be "read as a whole." *Jones v. Barnhart,* 364 F.3d 501, 505 (3d Cir. 2004).

Thus, the ALJ's finding that Plaintiff's spinal impairments did not meet or equal a Listing

was supported by substantial evidence.

**B.  Whether the ALJ Properly Considered Plaintiff's Impairments in Combination**

Plaintiff argues next that the ALJ committed legal error by "fail[ing] to consider the

combined effect of [P]laintiff's impairments as required by 20 C.F.R. § 404.1523." ECF No. 11

at 9. An ALJ fulfills his obligation to consider a claimant's impairments in combination with one

another if the ALJ explicitly indicates that he has done so, and there is "no reason not to believe

him." *Morrison ex rel. Morrison v. Comm'r of Soc. Sec.,* 268 F. App'x 186, 189 (3d Cir. 2008).

Here, Plaintiff contends that the ALJ took a "divide and conquer approach," discussing

each of Plaintiff's impairments separately in determining Plaintiff's RFC, rather than examining

their combined effects.  However, the ALJ expressly stated that he considered whether Plaintiff

had shown that his "mental impairments, considered singly and in combination," met or

medically equaled a Listing, and found that he had not. AR 26. He also considered whether

Plaintiff had demonstrated a "combination of impairments that meets or medically equals the severity of" any Listing and found that he had not, and whether Plaintiff's "combination of impairments … could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude [Plaintiff's RFC] as assigned" and found that it did not. AR 40. Such findings are sufficient for this Court to conclude that the ALJ examined Plaintiff's combination of impairments. *See Granados v. Comm'r of Soc. Sec.*, No. 13-781, 2014 WL 60054, at *9 n. 6 (D.N.J. Jan. 7, 2014) (finding ALJ's statement that "'[t]he combination of the degenerative disc disease, scoliosis, degenerative joint disease, obesity and carpal tunnel syndrome significantly interferes with the claimant's abilities to lift, carry, walk and stand'… evinces the ALJ's consideration of the combined effect of Plaintiffs impairments"). Thus, "the Court finds no reason to disbelieve the ALJ's indications that he considered the combined effect of Plaintiff's impairments." *Id.* at *9.

### C. The ALJ's Weighing of Certain Medical Opinions

Plaintiff next contends that the ALJ improperly weighed certain medical opinions. Specifically, Plaintiff objects to the ALJ's decision to afford greater weight to the opinions of the state agency medical consultants that Plaintiff could perform work at the sedentary exertional level; greater weight to the opinion of Dr. Yalamanchili that Plaintiff could perform work at the sedentary exertional level; greater weight to the opinion of Dr. Pannullo that Plaintiff could perform work at the sedentary exertional level; lesser weight to the opinion of Dr. Hillsman that Plaintiff has "a temporary total 100% disability" and "should not return to work"; lesser weight to the opinion of Dr. Karafin that Plaintiff "remains 100% disabled and unable to return to work"; and greater weight to the opinion of Dr. Merola that Plaintiff could occasionally lift and carry up to ten pounds and lesser weight to his remaining opinions.

It is well established that "the ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c).) Furthermore, while an ALJ must consider the opinions of treating physicians, "[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ" where it is not well supported or there is contradictory evidence. *Chandler*, 667 F.3d at 361 (alteration in original) (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011)).

Under 20 C.F.R. § 404.1527(c)(2), a treating source's opinion will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Several factors may also be used to determine the weight given to a medical opinion including: the length of the treatment relationship; the nature and extent of the treatment relationship; supportability by the medical evidence; and consistency with the record as a whole. *Id.* If a treating source's opinion conflicts with that of other medical sources, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). That is, the ALJ must rely only on "contradictory medical evidence" in rejecting the treating source's opinion, rather than "credibility judgments, speculation or lay opinion." *Id.* An ALJ may also grant less weight to a treating physician's opinion where it conflicts with his or her own treatment notes. *See, e.g., Millard v. Comm'r.,* 2014 WL 516525, at *2 (W.D.Pa. Feb.7, 2014). An ALJ is required to provide "an explanation of the reasoning behind [his] conclusions," including "reason(s) for discounting rejected evidence." *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d. Cir. 2001).

Plaintiff objects to the decision to grant greater weight to the opinion of the state agency medical consultants, Dr. Yalamanchili, and Dr. Pannullo, who all concluded, in 2014 and 2015, that Plaintiff could perform only sedentary work. According to Plaintiff, the ALJ erred in assigning these opinions great weight when Dr. Hillsman, Dr. Karafin, and Dr. Merola, all examined Plaintiff at later dates and, according to Plaintiff, found that Plaintiff could not perform sedentary work. However, the mere fact that that these medical opinions came later does not make them more reliable. As to the state agency medical consultants in particular, the Third Circuit has recognized "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision," but "[t]he Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler*, 667 F.3d at 361. The same goes for the opinions of the other treating physicians, Dr. Yalamanchili and Dr. Panullo, whose opinions are "not entitled to less weight than later ones for the mere fact that they were rendered first." *Templon v. Berryhill*, No. 17-84, 2018 WL 4219366, at *1 n.1 (W.D. Pa. Sept. 5, 2018).

Indeed, the ALJ explicitly examined all of the relevant medical opinion evidence and concluded that the opinions that Plaintiff was capable of sedentary work were supported by the record as a whole. In contrast, after carefully reviewing the medical evidence, he found that the assessments that Plaintiff was "100 percent disabled"

> are not consistent with the medical record as a whole as discussed in this decision… [Plaintiff] is able to perform work related activities commensurate with his residual functional capacity as assigned. The medical record suggests that [Plaintiff] improved with conservative treatment and/or surgery as described above. Further, … opinions regarding a claimant's ability to work are administrative findings and as such are reserved to the Commissioner.

AR 43. While the ALJ recognized that Plaintiff had severe symptoms due to his injuries, he correctly noted that, "the pivotal question is not whether such symptoms exist, but whether those

symptoms occur with such frequency, duration or severity as to reduce the claimant's residual functional capacity or to preclude all work activity on a continuing and regular basis." AR 38. Indeed, as the ALJ explained, the very same medical sources to which Plaintiff claims the ALJ assigned too little weight showed that Plaintiff "slowly improved and by August 2017 he was able to lift up to 25 pounds with an improved range of motion despite the presence of additional pathology revealed during…July." AR 39. Thus, even though the ALJ recognized that Plaintiff suffered from severe impairments, the medical record as a whole did not reflect that his disabilities rendered him incapable of doing any work, which justified affording lesser weight to medical sources that indicated otherwise.[3]

Thus, the ALJ's weighing of these medical opinions was supported by substantial evidence.

### D. The ALJ's Characterization of Plaintiff's Musculoskeletal Conditions as Degenerative

Plaintiff's final argument is that the ALJ "mischaracterized" Plaintiff's severe, medically determinable musculoskeletal impairments by identifying them as "degenerative," which, according to Plaintiff, "suggests that plaintiffs condition is either pre-existing, or due to age, that he worked with it, etc. [sic]" when, in fact, the conditions were caused by Plaintiff's work-related accident. ECF No. 11 at 15.

However, a review of the record reveals that medical sources in the record referred to Plaintiff's impairments as "degenerative." For instance, July 2014 x-rays of Plaintiff's lumbar

---

[3] Moreover, the opinions that Plaintiff was "disabled" for purposes of workers compensation are not equivalent to finding that he had an RFC that was less than sedentary: "[A] decision by any other governmental agency or a nongovernmental entity about whether you are disabled … or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled … under our rules." 20 C.F.R. § 404.1504; *see also id*. .1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

spine revealed "degenerative scoliosis," AR 966; November 2015 x-rays and MRI of Plaintiff's right shoulder revealed, in pertinent part, "degenerative changes" in the right AC joint and osteoarthritis, respectively, AR 997-99; and a February 2017 evaluation of Plaintiff's right knee revealed "[a]dvanced degenerative arthritis," which was also noted in May-August 2017 evaluations of Plaintiff's right knee. AR 1113-16, 1118. Moreover, whatever the ALJ called Plaintiff's impairments, he did not imply that they were caused by anything other than his work-related accident. *See, e.g.* AR 29 ("[Plaintiff] has had five surgical procedures since his work-related accident including a neck fusion, lumbar fusion, right kneesurgery, right shoulder surgery, and right bicep surgery"); AR 30 (noting that Plaintiff "was lifting heavy cable when his right knee buckled and he experienced right sided knee pain.").

Thus, substantial evidence supports the ALJ's identification of Plaintiff's severe, medically determinable musculoskeletal impairments as degenerative, but regardless, it is not that characterization that controls the ALJ's decision.

## IV. <u>CONCLUSION</u>

Plaintiff suffers from several severe impairments that have, no doubt, marred his quality of life and prevented him from continuing in his former line of work. However, the ALJ in this case wrote a thorough, detailed decision and cited substantial record evidence as to why Plaintiff, despite his impairments, was capable of performing sedentary work. While it is possible, given the severity of Plaintiff's injuries, that a different fact-finder would have reached another conclusion, it is not this Court's role, on appeal, to substitute its judgment for that of the ALJ. Thus, for the reasons set forth above, I find that the ALJ's decision is supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed.

Dated:  March 29, 2019                  <u>/s/ Freda L. Wolfson</u>
                                                     Hon. Freda L. Wolfson
                                                     United States District Judge